IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VANGUARD PRODUCTS GROUP, a                    07-CV-1405-BR
Florida corporation, and
TELEFONIX, INC., an Illinois                  AMENDED
corporation,                                  OPINION AND ORDER

       Plaintiffs,

v.

MERCHANDISING TECHNOLOGIES,
INC., an Oregon corporation,

       Defendant.


**ROBERT A. SHLACHTER**
**TIMOTHY S. DEJONG**
Stoll Stoll Berne Lokting & Shlachter, PC
209 S.W. Oak Street
Suite 500
Portland, OR 97204
(503) 227-1600

**ALAN T. McCOLLOM**
**HILLARY A. BROOKS**
Marger Johnson & McCollom, PC
210 S.E. Morrison Street
Suite 400
Portland, OR 97204-3189
(503) 222-3613


1 - AMENDED OPINION AND ORDER

**DAVID JOSEPH MARR**
Trexler, Bushnell, Giangiori & Blackstone, Ltd.
105 West Adams Street, 36th Floor
Chicago, IL 60603
(312) 704-1890

        Attorneys for Plaintiffs

**BRUCE A. KASER**
Vantage Law PLLC
355 N.W. Gilman Boulevard, Suite 203
Issaquah, WA  98027
(425) 391-8741

**JAMES L. PHILLIPS**
**KIERAN J. CURLEY**
Miller Nash LLP
601 Union Street, Suite 4400
One Union Square
Seattle, WA 98101
(206) 622-8484

**NANCIE K. POTTER**
**PAUL B. GEORGE**
Foster Pepper LLP
601 S.W. Second Avenue
Suite 1800
Portland, OR 97204-3171
(503) 221-0607

**LARA V. HIRSHFELD**
**ROBERT EDWARD BROWNE**
**THOMAS C. MCDONOUGH**
Neal, Gerber & Eisenberg
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-5385

        Attorneys for Defendant


**BROWN, Judge.**

     This matter comes before the Court on Plaintiffs' Motion

(#188) for Partial Summary Judgment (Equitable Estoppel),

2 - AMENDED OPINION AND ORDER

Plaintiffs' Motion (#116) for Partial Summary Judgment
(Infringement), Plaintiffs' Motion (#160) for Partial Summary
Judgment (False Marking), and Defendant's Motion (#132) for
Summary Judgment (Noninfringement, Invalidity, Obviousness).
After a thorough review of the record, the Court concludes oral
argument would not be helpful and, therefore, strikes the oral
argument previously set for January 16, 2009.

For the following reasons, the Court **GRANTS** Plaintiffs'
Motion for Partial Summary Judgment (Infringement), **GRANTS**
Plaintiffs' Motion for Partial Summary Judgment (False Marking),
**GRANTS** Plaintiffs' Motion for Partial Summary Judgment (Equitable
Estoppel), and **DENIES** Defendant's Motion for Summary Judgment
(Noninfringement, Invalidity, Obviousness).


## BACKGROUND

Defendant Merchandising Technologies, Inc., builds
interactive retail displays for hand-held consumer electronic
devices. Defendant's "Freedom" display units include
freestanding bases with retractable electric cables (retractors)
extending from the bases that supply power and antitheft security
to electronic products. Defendant purchased Telefonix retractors
from Plaintiff Vanguard Products Group, Telefonix's exclusive
licensee, from early 2000 through some point in 2005.

On October 5, 2004, the Patent Trade Office (PTO) issued

3 - AMENDED OPINION AND ORDER

Patent No. 6,799,994 ('994 Patent) to Telefonix, Inc.  The '994

Patent is described as follows:

> A cord management apparatus that provides for the
> convenient management of cords associated with the
> retail display of small electronic devices, such
> as video cameras.  The apparatus comprises a
> multi-conductor device, an adapter for connecting
> the cable to the electronic device, and a base
> member for removably holding the mounting member.
> The base member is fastened to a display rack or
> counter.  A plurality of adaptors are provided so
> that the apparatus may be used with a wide variety
> of devices that may have different connection
> requirements.

On August 1, 2005, Defendant[1] filed an action in this Court

against Plaintiffs, 05-CV-1195-BR, alleging Plaintiffs violated

the Sherman Act, 15 U.S.C. §§ 1 and 2; seeking a declaration that

Defendant was not infringing the '994 Patent; and seeking a

declaration that the '994 Patent is invalid.

On September 19, 2005, Defendant filed a First Amended

Complaint in the 2005 action alleging Plaintiffs violated §§ 1

and 2 of the Sherman Act; seeking a declaration that Defendant

was not infringing any claim of the '994 Patent; seeking a

declaration that the '994 Patent is invalid; and adding claims

for false marking in violation of 35 U.S.C. § 292, prosecution

laches with respect to the '994 Patent, and violation of Oregon

---

[1] When referring to the 2005 action, the Court uses the term
"Defendant" to refer to Merchandising Technologies, Inc., the
Defendant in this action and the Plaintiff in the 2005 matter.
Likewise, the Court uses the term "Plaintiffs" to refer to
Vanguard Products Group and Telefonix, Inc., the Plaintiffs in
this case who were Defendants in the 2005 matter.

Revised Statutes § 646.608.

On December 30, 2005, Defendant filed a Second Amended Complaint in the 2005 action in which it alleged claims against Plaintiffs for monopolization through fraud in procuring the '994 Patent in violation of § 2 of the Sherman Act and for tying in violation of § 2 of the Sherman Act. Defendant sought damages and injunctive relief pursuant to § 26 of the Sherman Act or in the alternative, a declaration that it is not infringing the '994 Patent and that the '994 Patent is invalid and unenforceable. Defendant also brought claims against Plaintiffs for false marking in violation of 35 U.S.C. § 292; prosecution laches with respect to the '994 Patent; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); and violation of Oregon Revised Statutes § 646.608.

On February 10, 2006, Plaintiffs filed a Motion to Dismiss in the 2005 action seeking to dismiss Defendant's Second Amended Complaint.

On December 1, 2006, the parties in the 2005 action filed a Joint Submission in which (1) Plaintiffs withdrew their Motion to Dismiss as to Defendant's false-marking claim and (2) Defendant voluntarily dismissed its claims against Plaintiffs for tying in violation of § 2 of the Sherman Act, for unfair competition in violation of the Lanham Act, and for violation of Oregon Revised Statutes § 646.608.

5 - AMENDED OPINION AND ORDER

On February 7, 2007, the Court issued an Opinion and Order
in the 2005 action in which, among other things, it granted
Plaintiffs' Motion to Dismiss the declaratory-judgment patent
claims on the ground that the Court lacked subject-matter
jurisdiction over those claims because Defendant had "not
established a basis for an objectively reasonable apprehension at
the time of filing [the 2005] action that [Plaintiffs] would
imminently file a patent-infringement action against
[Defendant]," and, therefore, Defendant "failed to show that an
actual controversy existed."  Opinion and Order, 05-CV-1195-BR at
27 (Feb. 7, 2007).

By April 19, 2007, however, a controversy clearly arose when
Plaintiffs filed a patent-infringement action against Defendant
in the United States District Court for the Northern District of
Illinois in which Plaintiffs alleged Defendant made, used, and/or
offered for sale products that infringed the '994 Patent.

On September 21, 2007, the District Court in Illinois
transferred the matter to this Court.

On November 16, 2007, this Court signed the parties'
Stipulated Dismissal Without Prejudice and dismissed the 2005
action (05-CV-1195-BR) without prejudice.  Also on that date,
Defendant filed a First Amended Answer, Affirmative Defenses, and
Counterclaim in this action in which it asserted five affirmative
defenses:  failure to state a claim, no patent infringement,

6 - AMENDED OPINION AND ORDER

invalidity and unenforceability of the patent, estoppel, and waiver/laches.  Defendant also pleaded two Counterclaims:  false marking and unfair competition in violation of 15 U.S.C. § 1125(a).

On February 28 and 29, 2008, the Court held a *Markman* hearing and construed disputed Claims 1, 7, 8, and 10 during the hearing.  On March 24, 2008, the Court issued an Order confirming the Court's claims construction.

On April 7, 2008, the Court issued an Opinion and Order granting Plaintiffs' Motion to Dismiss Defendant's Counterclaim for unfair competition.

Subsequently, the parties filed their Cross-Motions for Summary Judgment.

## STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact.  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id*.

7 - AMENDED OPINION AND ORDER

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id.*  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment.  *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of

the claim, the court may grant summary judgment.  *Id.*

Because the issues raised in the parties' Motions for

Summary Judgment arise within the context of a patent action, the

law of the Federal Circuit applies.  *See MedImmune, Inc. v.*

*Centocor, Inc.*, 409 F.3d 1376, 1378 (Fed. Cir. 2005).


## PLAINTIFFS' MOTION (#188) FOR PARTIAL SUMMARY JUDGMENT (EQUITABLE ESTOPPEL)

Plaintiff seeks summary judgment as to Defendant's

affirmative defense of equitable estoppel.

### Background

On May 14, 2002, Plaintiffs filed a continuation application

that ultimately resulted in the '994 Patent issued October 5,

2004.  On May 15, 2002, Telefonix's patent prosecution attorney,

Paul Juettner, copied Lee Grossman on a letter to Telefonix's

president, Paul Burke, in which Juettner enclosed "a copy of a

continuing application on the subject disclosure."  Lee Grossman

denies receiving the enclosure and does not recall learning about

the '994 Patent continuation application on May 15, 2002.[2]

On May 24, 2002, Plaintiffs and Defendant were named as co-

defendants in a patent-infringement case filed in the United

_____

[2] The Court notes the form of the May 15, 2002, letter in
the record is entirely redacted except for the portion quoted
above.  Lee Grossman was presented with the redacted form at his
deposition and noted it was not possible for him to be sure the
letter actually referred to the '994 Patent continuation
application.

9 - AMENDED OPINION AND ORDER

States District Court for the Northern District of Illinois: *Se-Kure Controls, Inc. v. Vanguard Products Group, Inc.*, No. 02-CV-3767.  According to Defendant, Plaintiffs were represented by Mark and Lee Grossman in the *Se-Kure* action, and Burke offered to have the Grossmans also represent Defendant in the *Se-Kure* action because Defendant purchased products from Plaintiffs that were the subject of the *Se-Kure* litigation.  Defendant agreed and hired the Grossmans to represent it in the *Se-Kure* matter.[3]  The Grossmans represented both Plaintiffs and Defendant in the *Se-Kure* matter from July 16, 2002, through April 30, 2005.

From February 7, 2003, through October 4, 2004, Mark Hanley of Grossman & Flight prosecuted the '994 Patent.  As noted, the PTO issued the '994 Patent on October 5, 2004.

Lee Grossman was a partner at Grossman & Flight until November 2004.  From November 2004 through April 30, 2005, Mark and Lee Grossman were partners at the Grossman Law Offices.

On February 25, 2005, Vanguard's President, Chris Kelsch, notified Defendant that Vanguard had obtained the '994 Patent.

## **Standards**

Equitable estoppel is a defense to a claim for patent infringement.  35 U.S.C. § 282.  To bar a patentee's action for

---

[3] Plaintiffs dispute whether Lee Grossman represented Defendant at any time, but Plaintiffs assume he did so for the sole purpose of their Motion for Partial Summary Judgment on the estoppel issue.

10 - AMENDED OPINION AND ORDER

infringement on the basis of equitable estoppel, the alleged

infringer must establish:

> 1) the patentee, through misleading conduct, leads
> the alleged infringer to reasonably infer that the
> patentee does not intend to enforce its patent
> against the alleged infringer, 2) the alleged
> infringer relies on that conduct, and 3) due to
> its reliance, the alleged infringer will be
> materially prejudiced if the patentee is allowed
> to proceed with its claim.

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed. Cir.

2001)(citing *Scholle Corp. v. Blackhawk Molding Co.*, Inc., 133

F.3d 1469, 1473 (Fed. Cir. 1998)).

## Discussion

Defendant asserts Plaintiffs should be equitably estopped

from asserting against Defendant their rights under the '994

Patent because (1) Plaintiffs misappropriated confidential

information belonging to Defendant and (2) Plaintiffs are liable

for the failure of their attorneys, the Grossmans, to disclose to

Defendant that Plaintiffs filed a continuation application as to

the '994 Patent before that patent issued.

**I.   Defendant's Misappropriation Theory.**

Defendant contends Plaintiffs should be equitably estopped

from asserting against Defendant their rights under the '994

Patent.  According to Defendant, it communicated confidential

information to its attorneys, the Grossmans, who in turn

disclosed the information to Plaintiffs, their other clients, for

Plaintiffs' use in modifying their '994 Patent application.

11 - AMENDED OPINION AND ORDER

In their Motion for Summary Judgment, Plaintiffs assert
Defendant has not identified any evidence to support its
allegations regarding the alleged misappropriation of
confidential information.  In its initial Response to Plaintiff's
Motion, Defendant contended summary judgment on this issue was
premature because Defendant was "in the process of collecting
evidence to support" this defense.  Defendant asserted it would
submit evidence to support the defense "after it has received
Grossman & Flight billing records . . . and completes Mr. Haney's
deposition."  In its Supplemental Response in Opposition to
Plaintiff's Motion filed after Haney's deposition and after
Defendant received the Grossman & Flight billing records,
however, Defendant still does not point to any evidence to
support its misappropriation theory.  As Plaintiffs note in their
Reply, Haney testified at deposition that he did not receive any
of Defendant's confidential information and that he did not make
any changes in the '994 Patent claim language in order to cover
Defendant's products.

On this record, therefore, the Court concludes Defendant has
not shown a triable issue of fact exists as to whether the
Grossmans communicated confidential information to Plaintiffs or
that Plaintiffs used Defendant's confidential information to
change the '994 Patent claim language.  Accordingly, the Court
grants Plaintiff's Motion for Partial Summary Judgment as to the

misappropriation theory underlying Defendant's affirmative defense of equitable estoppel.

**II.  Duty to disclose and/or to withdraw.**

Defendant also contends Plaintiffs should be estopped from asserting against Defendant their rights under the '994 Patent because the attorneys jointly representing Plaintiffs and Defendant, the Grossmans, had a duty to disclose to Defendant that Plaintiffs filed the '994 Patent continuation application before the '994 Patent issued and/or had a duty to withdraw from the joint representation in the *Se-Kure* matter when they realized they had a conflict of interest as between the interests of Plaintiffs and Defendant.  Plaintiffs, in turn, assert the Grossmans did not have a duty to disclose to Defendant that Plaintiffs filed the continuation application, and Plaintiffs contend the Grossmans were prohibited in any event from doing so by applicable rules of ethical conduct.

**A.  Illinois law governs whether the Grossmans had a duty to disclose and/or to withdraw.**

The parties agree the law of the Federal Circuit applies to this patent action.  Because it is undisputed the Grossmans are Illinois lawyers and were representing the parties in a case pending in Illinois, however, Plaintiffs contend Illinois law and the Illinois Rules of Professional Conduct govern whether the Grossmans had a duty to disclose and/or to withdraw from the joint representation and whether their failure

13 - AMENDED OPINION AND ORDER

to do so should be imputed to Plaintiffs in this matter.
Defendant disagrees and argues district courts sitting in
federal-question cases apply the privilege law of the regional
circuit in which the court is located and, therefore, Defendant
asserts by analogy that Oregon law governs this issue.

       Under these circumstances, the Court concludes
Plaintiffs' position is more persuasive.  Here the Court is not
deciding a substantive evidentiary issue (such as applicable
rules of privilege) but instead the Court is evaluating the
Grossmans' duties under the ethical rules of conduct they were
bound to follow while representing the parties in the Illinois
*Se-Kure* litigation.  Because the Grossmans are and were Illinois
attorneys at all relevant times and they allegedly breached their
professional obligations in the course of their work in
connection with a case pending in the United States District
Court for the Northern District of Illinois, the Court concludes
it should look to Illinois law and the Illinois Rules of
Professional Conduct to determine whether the Grossmans were
required to or prohibited from informing Defendant that
Plaintiffs filed the '994 Patent continuation application before
that patent issued and whether any breach of their professional
duties to do so should be imputed to Plaintiffs.

**B. The Grossmans did not have a duty to disclose that Plaintiffs had filed the '994 Patent continuation application before that patent issued.**

As to the issue of the Grossmans' alleged duty to disclose, Plaintiffs concede solely for purposes of their Motion for Partial Summary Judgment that (1) the Grossmans knew about the '994 Patent continuation application before that patent issued, (2) the Grossmans represented both Plaintiffs and Defendant in the *Se-Kure* litigation during the time at issue, and (3) the Grossmans' knowledge was sufficient to create conflicting duties of loyalty to Plaintiffs and Defendant. Nevertheless, Plaintiffs assert Defendant cannot establish its defense of equitable estoppel because Defendant has not shown the Grossmans had a duty to disclose to Defendant that Plaintiffs had filed the '994 Patent continuation application before that patent issued or that any breach of the Grossmans' duties to do so can be imputed to Plaintiffs.

The Federal Circuit has held "[s]ilence alone will not create an estoppel unless there was a clear duty to speak." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1043 (Fed. Cir. 1992). *See also Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992)("Silence alone is not sufficient affirmative conduct to give rise to estoppel.").

Illinois Rule of Professional Conduct 1.6(a) provides:

> Except when required under Rule 1.6(b) or
> permitted under Rule 1.6(c), a lawyer shall not,

15 - AMENDED OPINION AND ORDER

> during or after termination of the professional
> relationship with the client, use or reveal a
> confidence or secret of the client known to the
> lawyer unless the client consents after
> disclosure.

The Illinois Rule of Professional Conduct define "confidence" as "information protected by the lawyer-client privilege."  Ill. S. Ct. Rules of Prof'l Conduct Art. VII.  The Rules also define "secret" as "information gained in the professional relationship, that the client has requested to be held inviolate or the revelation of which would be embarrassing to or would likely be detrimental to the client."  *Id*.  The attorney-client privilege, therefore, does not encompass all of the information an attorney is required to hold "secret" and "confidential" under the Illinois Rules of Professional Conduct.  *See In re Marriage of Decker*, 153 Ill. 2d 298, 314 (1992)("In addition to the attorney-client privilege, there exists the attorney's rule of confidentiality, which encompasses the attorney-client evidentiary privilege as well as the attorney's fiduciary duty to his client. . . .  Unlike the evidentiary attorney-client privilege, the rule of confidentiality applies not only during judicial proceedings, but at all times, and to client's secrets, as well as confidences.").

The issue here is determining the scope of the duty of an attorney to reveal the secrets or confidences of one joint client to another joint client when the interests of the joint

16 - AMENDED OPINION AND ORDER

clients diverge.   In a 1991 advisory opinion, the Illinois State
Bar Association (ISBA) addressed the following scenario:

> An attorney represents two individuals who have
> formed an investment partnership.   The partnership
> agreement requires each partner to offer to the
> partnership all investments offered to them
> individually.
>
> The attorney has also represented the partners
> individually in various matters, including
> investment opportunities that a partner has not
> made available to the partnership.

Ill. Adv. Opin. 90-15, 1991 WL 735056 (Jan 29, 1991).   The ISBA
addressed the following question:   "Does the attorney have a duty
to inform the partner who has not been offered an opportunity to
participate in the other partner's investment?"   *Id*.   The ISBA
advised:   "Consistent with . . . Rule 1.6, we are of the view
that the inquiring attorney may not disclose the first partner's
breach of contract to the second partner to whom participation in
investment opportunities was not offered."   *Id*.

Similarly, the American Bar Association (ABA) issued a
Formal Ethics Opinion in 2008 restating its position on the duty
of confidentiality in the context of joint representation.   The
ABA noted

> [l]awyers frequently are engaged to represent a
> client by a third party, most commonly an insurer
> or a relative.   In some circumstances, the third
> party also may be a client of that lawyer, either
> with respect to the matter in question, or with
> respect to a related matter.   When a lawyer
> represents multiple clients, either in the same or
> related matters, Model Rule 1.6 requires that the
> lawyer protect the confidentiality of information

> relating to each of his clients.  Because the
> scope of the "implied authority" granted in Rule
> 1.6(a) to reveal confidential information "to
> carry out a representation" applies separately and
> exclusively to each representation the lawyer has
> undertaken, a conflict of interest arises when the
> lawyer recognizes the necessity of revealing
> confidential information relating to one client in
> order effectively to carry out the representation
> of another.

ABA Formal Opin. 08-450, at 1 (Apr. 9, 2008).  The ABA advised:

> Absent an express agreement among the lawyer and
> the clients that satisfies the "informed consent"
> standard of Rule 1.6(a), the Committee believes
> that whenever information related to the
> representation of a client may be harmful to the
> client in the hands of another client or a third
> person, the lawyer is prohibited by Rule 1.6 from
> revealing that information to any person,
> including the other client and the third person.

*Id*. at 2.

Based on Illinois Rule of Professional Conduct 1.6, the
ISBA interpretation of that Rule, and the ABA's advice as to
Model Rule 1.6, the Court concludes on this record that the
Grossmans were prohibited from informing Defendant that
Plaintiffs had filed the '994 Patent continuation application
before that patent issued.  Accordingly, the Court concludes the
Grossmans did not have a duty to disclose to Defendant that
Plaintiffs had filed the '994 Patent continuation application
even though the Grossmans jointly represented Plaintiffs and
Defendant in the *Se-Kure* matter, and the Grossmans' silence,
therefore, is not a sufficient basis for Defendant to create a
triable issue as to its affirmative defense of equitable

18 - AMENDED OPINION AND ORDER

estoppel.

**C.    The Grossmans had a duty to withdraw.**

It is undisputed that when the Grossmans realized they had a conflict (*i.e.*, when they realized Plaintiffs had filed the '994 Patent continuation application), they should have withdrawn from their joint representation of the parties.  Defendant points to the Grossmans' failure to withdraw as an additional basis to estop Plaintiffs from asserting their rights under the '994 Patent.

The Third Circuit recently analyzed an attorney's continuing duty to maintain client secrets and confidences against joint clients even if the attorney fails to follow the proper course of withdrawal.  In the matter of *In re Teleglobe Communications Corp.*, the court noted

> [t]he Restatement's conflicts rules provide that when a joint attorney sees the co-clients' interests diverging to an unacceptable degree, the proper course is to end the joint representation. Restatement (Third) of the Law Governing Lawyers § 121 cmts. e(1)-(2).  As the Court of Appeals for the D.C. Circuit noted in *Eureka Inv. Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932 (D.C. Cir. 1984)(*per curiam*), courts are presented with a difficult problem when a joint attorney fails to do that and instead continues representing both clients when their interests become adverse. *Id.* at 937-38.  In this situation, the black-letter law is that when an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct.  *Id.; see also* 8 J. Wigmore, Evidence § 2312 (McNaughton rev. ed. 1961).

19 - AMENDED OPINION AND ORDER

493 F.3d 345, 368 (3d Cir. 2007).  The court also noted the court in *Eureka* concluded "'counsel's failure to avoid a conflict of interest should not deprive the client of the privilege.  The privilege, being the client's, should not be defeated solely because the attorney's conduct was ethically questionable.'"  *Id.* at 369 (quoting *Eureka*, 743 F.2d at 938).  The court also noted "the *Eureka* principle is widely accepted.  *See* Restatement (Third) of the Law Governing Lawyers § 60 cmt. l.; Rice § 4:33."  *Id.*

In *Eureka*, the plaintiff's insurance company, Chicago Title Insurance Company (CTI), agreed to pay the plaintiff's legal expenses to defend an action brought against the plaintiff by tenants of an apartment building owned by the plaintiff.  Over the course of the litigation, however, the plaintiff and CTI began to disagree about how to proceed.  The plaintiff wanted to settle, and CTI wanted to continue to litigate.  *Eureka*, 743 F.2d at 936-37.  The plaintiff, relying on the advice of the attorneys representing both the plaintiff and CTI, entered into a settlement and brought an action against CTI for indemnification and consequential damages.  *Id.*  In the course of the indemnification action, CTI sought discovery of the plaintiff's communications with counsel on the basis of the joint-client exception to the attorney-client privilege.  The court concluded the plaintiff did not have to disclose the documents at issue:

20 - AMENDED OPINION AND ORDER

Here, although there was no secrecy with respect
to the defense of tenant claims, Eureka assuredly
was concealing from CTI its consideration of legal
action against the latter. . . . [In addition,]
although [counsel] was representing Eureka and CTI
in a matter of common interest at the time the
communications at issue were made, those
communications were not made in the course of its
representation on that matter; indeed, they were
made in the course of representation distinctly
not in the interest of CTI.

* * *

The communications sought here were made not only
after the interests of CTI and Eureka diverged but
after their common attorney knew they diverged
. . . . We need not express any view on CTI's
contention that [counsel] should not have
simultaneously undertaken to represent Eureka in
an interest adverse to CTI and continued to
represent CTI in a closely related matter. . . .
[C]ounsel's failure to avoid a conflict of
interest should not deprive the client of the
privilege.  The privilege, being the client's,
should not be defeated solely because the
attorney's conduct was ethically questionable.  We
conclude, therefore, that Eureka was privileged
not to disclose the requested documents.

*Id.* at 937-38.

The Court finds the reasoning of *Teleglobe* and *Eureka*
persuasive and concludes by analogy that the Grossmans' failure
to withdraw from their joint representation when it became clear
that the Grossmans had a conflict of interest cannot be imputed
to Plaintiffs for purposes of estopping Plaintiffs from asserting
against their rights under the '994 Patent.

Accordingly, the Court concludes the Grossmans' ethical
failure to withdraw is not a sufficient basis for Defendant to

21 - AMENDED OPINION AND ORDER

create a triable issue of fact as to its affirmative defense of equitable estoppel.

**D.  Plaintiffs' actions in the current litigation do not estop Plaintiffs from asserting their rights under the '994 Patent.**

In its Supplemental Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Defendant also contends Plaintiffs should be estoped from asserting against Defendant their rights under the '994 Patent because Plaintiffs sought to quash the depositions of the Grossmans and "allowed the Grossmans to provide deposition testimony denying knowledge of or involvement in the '994 patent application" during the course of this litigation.

As noted, to prevail on its equitable estoppel defense, Defendant must establish, among other things, that Plaintiffs through misleading conduct, led Defendant to reasonably infer that Plaintiffs did not intend to enforce the '994 Patent against Defendant.  Defendant, however, does not provide any factual basis that establishes Plaintiffs' actions during the course of this litigation led Defendant to reasonably infer that Plaintiffs did not intend to enforce the '994 Patent.  To the contrary, once Plaintiffs initiated enforcement litigation in Illinois, Defendant could not have reasonably believed Plaintiffs did not intend to pursue their rights under the '994 Patent.

The Court, therefore, concludes Plaintiffs' alleged

22 - AMENDED OPINION AND ORDER

misconduct in this litigation does not constitute a basis for
Defendant's affirmative defense of equitable estoppel.

In summary, the Court concludes on this record that
Defendant has not established any triable issue as to the
elements of ifs affirmative defense of equitable estoppel.
Accordingly, the Court grants Plaintiffs' Motion (#188) for
Partial Summary Judgment.


### PLAINTIFF'S MOTION (#116) FOR PARTIAL SUMMARY JUDGMENT (INFRINGEMENT) and DEFENDANT'S MOTION (#132) FOR SUMMARY JUDGMENT (NONINFRINGEMENT, INVALIDITY, OBVIOUSNESS)

In their Motion for Summary Judgment as to infringement,
Plaintiffs seek summary judgment that Defendant's Freedom
Universal, Freedom A, Freedom A+, and Freedom C products
literally infringe Claims 1, 2, and 4-11 of the '994 Patent.
Plaintiffs also seek summary judgment that Defendant's Freedom LP
product infringes Claims 1, 2, 4, and 6-11 of the '994 Patent.

By cross-motion, Defendant seeks summary judgment of non-
infringement and, in the alternative, moves the Court to hold the
'994 Patent is invalid on the basis of obviousness and
indefiniteness.  In addition, Defendant seeks to judicially estop
Plaintiffs from enforcing their rights under the '994 Patent.

### Standards

A patent holder has the right to "exclude others from

making, using, offering for sale, or selling the invention
throughout the United States or importing the invention into the
United States." 35 U.S.C. § 154(a)(1). A party infringes the
patent if, "without authority," it "makes, uses, offers to sell,
or sells any patented invention, within the United States." 35
U.S.C. § 271(a).

The boundaries of an invention are defined by patent claims
contained in a "specification." 35 U.S.C. § 112. The
specification must "conclude with one or more claims particularly
pointing out and distinctly claiming the subject matter which the
applicant regards as his invention." *Id.*

Claims may be written in independent or dependent form. *Id.*
A dependent claim includes all of the elements of that claim as
well as all of the elements of the claim on which it depends. A
dependent claim "shall contain a reference to a claim previously
set forth and then specify a further limitation of the subject
matter claimed" and "shall be construed to incorporate by
reference all the limitations of the claim to which it refers."
*Id.* Ordinarily "if an accused infringer does not infringe an
independent claim, it cannot infringe claims that depend on that
independent claim." *Streamfeeder, LLC v. Sure-Feed Sys., Inc.,*
175 F.3d 974, 984 (Fed. Cir. 1999)(citation omitted).

Infringement analysis involves two steps: (1) "[T]he court
determines the scope and meaning of the patent claims asserted"

through claim construction and (2) "the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Tech., Inc.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998)(citations omitted).

Whether literal infringement has occurred is ordinarily a question of fact. *Insituform Tech., Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 692 (Fed. Cir. 1998), *cert. denied,* 526 U.S. 1018 (1999). Literal infringement of a claim exists "when every limitation recited in the claim is found in the accused device." *Enercom GmbH v. Int'l Trade Comm'n,* 151 F.3d 1376, 1385 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1130, *reh'g denied,* 527 U.S. 1054 (1999)(citation omitted).

## Discussion

## I.   Infringement Analysis

### A.   Claim 1 of '994 Patent.

Claim 1 provides:

> 1.   A cable management apparatus for use with a plurality of electronic devices, comprising:
>
> a first cable assembly having a length, a modular connector, and a plurality of electrical conductors;
>
> a reel that retractably stores at least a portion of the length of the first cable assembly;
>
> a mounting member adapted to receive an end of the first cable assembly and at least one of the plurality of electronic devices; and

a second cable assembly from a plurality of
cable assemblies associated with the plurality of
electronic devices, wherein the second cable
assembly is adapted to electrically couple the at
least one of the plurality of electronic devices
to the end of the first cable assembly, and
wherein the first cable assembly is configured to
be electrically coupled to each of the plurality
of cable assemblies via the modular connector.

The record reflects Defendant's products at issue are
cable- management apparatuses for use with a plurality of
electronic devices.  Although Jason Goldberg, Defendant's Rule
30(b)(6) expert on infringement, testified Defendant's products
are "merchandising apparatus[es] for use with a plurality of
electronic devices," he later testified they also could "be
considered [to be] cable management apparatus[es]."  Declaration
of Kieran J. Curley, Ex. L at 14.  The parties do not dispute
Defendant's products have a reel that retractably stores at least
a portion of the length of the first cable assembly, a mounting
member adapted to receive an end of the first cable assembly, and
at least one of the plurality of electronic devices.

Nonetheless, the parties dispute what Defendant's first
cable assembly comprises and whether the first cable assembly in
Defendant's products is configured to be electrically coupled to
each of the plurality of cable assemblies via the modular
connector.

      **1.**    **Freedom Universal and Freedom LP products**.

Defendant's Freedom Universal and Freedom LP

products have a second cable assembly in the form of a "smart cable" that attaches from the electronic device displayed to the "puck" or plastic mounting member.  Defendant notes even though the smart cable plugs into the mounting member, it actually connects inside the mounting member to a voltage regulator board containing an electronic circuit board (ECB).  The ECB adapts the voltage coming through the retractor of the first cable assembly to the proper voltage for the device attached through the second cable assembly.  Defendant asserts the first cable assembly does not encompass the ECB, and, therefore, the first cable assembly is not configured to be electrically coupled to each of the plurality of cable assemblies via the modular connector.  According to Defendant, the first cable assembly is actually coupled to the ECB, which, in turn, is coupled to the second cable assembly.

Plaintiffs contend the plain and ordinary meaning of "first cable assembly" encompasses elements such as Defendant's ECB.  In any event, Plaintiffs assert the Court need not decide whether the first cable assembly includes the ECB in light of the fact that at the *Markman* hearing held on February 28 and 29, 2008, the Court declined to interpret Claim 1 to require a direct wire-to-wire connection between the first and second cable assemblies and the device displayed.  According to Plaintiffs, therefore, the "electrical path between the first and

27 - AMENDED OPINION AND ORDER

second cable assemblies is sufficient for infringement" even if
the ECB is not included in the first cable assembly.  Thus,
Plaintiffs assert Defendant's products meet each of the
limitations in Claim 1.

Because the Court concludes the issue as to
whether the first cable assembly encompasses elements such as
Defendant's ECB requires more analysis than simply looking to the
Court's interpretation of Claim 1 at the *Markman* hearing, the
Court examines whether the first cable assembly includes the ECB
under the '994 Patent.

### a.   Plain meaning of first cable assembly.

As noted, Claim 1 provides "a first cable
assembly having a length, a modular connector, and a plurality of
electrical conductors."  At the *Markman* hearing, the parties did
not ask the Court to construe the phrase "first cable assembly"
and agreed that phrase would have its plain and ordinary meaning.

Plaintiffs rely on seven other patents that
include circuit boards and other components as well as the
Supplemental Declaration of John Hunt, an instructor and research
designer in the Department of Computer Science at Oregon Health
Sciences University (OHSU), to support their assertion that the
plain and ordinary meaning of "first cable assembly" encompasses
an assembly that includes an ECB.  As to the seven other patents
relied on by Plaintiffs, the Court notes all but one of them

28 - AMENDED OPINION AND ORDER

specifically recite connections to circuit boards in their claims.  The remaining patent recites a connection to a "PC card including input-output circuitry."  The '994 Patent, on the other hand, does not include references to a circuit board in Claim 1 or in any other part of the Patent.  The other patents, therefore, are not helpful to the Court in determining whether the plain meaning of "first circuit assembly" in this case encompasses the ECB.

John Hunt testifies in his Supplemental Declaration that

> [i]n electrical engineering practice, the term "cable assembly" does not refer to any single embodiment of structure.  It is a commonly used, general term that refers to a range of electrical or optical cable structures.  The plain and ordinary meaning of "cable assembly" encompasses assemblies that incorporate a length of cable and one or more of the following elements:  a connector, an ECB (circuit board), an integrated circuit (including a voltage regulator), a microprocessor, a resistor or resistive voltage divider, a fusible link, a voltage detector, and a noise filter.

Hunt Decl. ¶ 4.  Hunt further testifies

> because the preferred embodiment [of the '994 Patent] itself includes electrical components not recited in the claims, for example additional connectors, a cord, and a light sensor, . . . a person of ordinary skill in the art would have understood that Mr. Burke's invention encompassed embodiments incorporating cable assemblies with additional electrical components, including for example, those described above in Paragraph 4, all of which were known on the filing date of the '994 patent.

29 - AMENDED OPINION AND ORDER

*Id.* at ¶ 5.  Thus, Hunt's testimony supports the conclusion that the plain and ordinary meaning of first cable assembly encompasses an ECB like that in Defendant's products.

In addition, the Court notes Claim 1 begins with the phrase "a cable management apparatus . . . comprising." The Federal Circuit has held the term "comprising" is open-ended and does not exclude additional, unrecited elements. *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004)("'[t]he transitional term 'comprising'. . . is synonymous with 'including,' 'containing,' or 'characterized by,' [and] is open-ended and does not exclude additional, unrecited elements or method steps.'")(quoting Manual of Patent Examining Procedure, 8th ed., rev. 1 § 2111.03 (2003)).  *See also Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)("Comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.").  Thus, although the named elements of the first cable assembly in Claim 1 (*i.e.*, "a length, a modular connector, and a plurality of electronic conductors") are essential, other elements such as an ECB may be added and still remain within the scope of Claim 1.

To support its position, Defendant relies on the fact that the ECB assembly does not retract into the reel and further states it acquires the retractable cable assembly and ECB

30 - AMENDED OPINION AND ORDER

from different sources and assembles them.  Defendant maintains these factors show the first cable assembly does not include the ECB.

The Court notes Claim 1, however, requires only that the reel "retractably" store "at least a portion of the length of the first cable assembly."  The reel in Defendant's products store at least a portion of the cable assembly (*i.e.*, the retractable cable), and, therefore, the fact that the ECB does not retract into the reel is not dispositive.  In addition, as Plaintiffs note in their Reply, the fact that the ECB and retractable cable are manufactured separately and assembled as a "physically joined" part of the puck does not disprove that the first cable assembly encompasses the ECB because, by definition, an "assembly" is comprised of elements that are assembled or combined.

Accordingly, the Court concludes the plain and ordinary meaning of "first cable assembly" as used in Claim 1 encompasses the ECB in Defendant's Freedom Universal and Freedom LP products.

**b.    First cable assembly configuration.**

Even if the proper construction of the first cable assembly includes the ECB, Defendant also maintains its products do not infringe Claim 1 because the plain language of Claim 1 requires the first cable assembly to be configured "to be

31 - AMENDED OPINION AND ORDER

electrically coupled to each of the plurality of cable assemblies via the modular connector." Defendant asserts the critical issue is whether the first cable assembly is configured to transfer power to multiple numbers of smart cords rather than whether there is a power transfer between the first and second cable assemblies. Defendant also argues the first cable assembly in its products is not configured to be electronically connected to a multiple number of smart cords via the modular connector. Defendant notes it is, in fact, the ECB rather than the modular connector in its retractable cable that enables the user to "swap" different smart cords to and from Defendant's product.

Because the Court has found the plain and ordinary meaning of "first cable assembly" in Claim 1 encompasses components such as the ECB in Defendant's products, the Court also concludes Plaintiffs have conclusively established the first cable assembly (including the ECB) in Defendant's products is configured to be electrically coupled the plurality of cable assemblies via the modular connector.

    2.   **Freedom A, A+, and C products.**

It is undisputed that the only difference between Defendant's Freedom Universal/Freedom LP products and its Freedom A, A+, and C products are that the retractor cable extends into the puck, the wires on the end of the retractor cable are soldered directly to the ECB, and the female portion of the smart

32 - AMENDED OPINION AND ORDER

cable connector is physically connected to the ECB in the Freedom A, A+, and C products.  These differences, however, do not alter the Court's infringement analysis as to Claim 1.

Accordingly, the Court concludes the plain and ordinary meaning of "first cable assembly" in Claim 1 encompasses the ECB in Defendant's Freedom A, A+, and C products, and, therefore, Plaintiffs have conclusively established that these products meet all of the limitations of Claim 1.

**B.    Claims 2-4 of the '994 Patent.**

Dependent Claims 2-4 of the '994 Patent provide:

> 2.   A cable management apparatus as defined in claim 1, wherein the first cable assembly is adapted to convey at least one of a power signal and a security signal.
>
> 3.   A cable management apparatus as defined in claim 1, wherein the plurality of electrical conductors is adapted to carry a plurality of different supply voltages associated with the plurality of electronic devices.
>
> 4.   A cable management apparatus as defined in claim 1, wherein the plurality of electrical conductors is adapted to carry a security signal.

In its Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Defendant acknowledges Plaintiffs have to prove infringement of only one independent claim of the '994 Patent (*e.g.*, either Claim 1 or Claim 8) to establish that Defendant's products also infringe dependent claims 2-4 and 9-11.  The Court agrees.

The Court already has concluded Defendant's products

33 - AMENDED OPINION AND ORDER

infringe Claim 1 of the '994 Patent.  Based on Defendant's

concession in their Opposition and on Goldberg's testimony that

the first cable assembly and the electrical conductors in

Defendant's devices are designed to convey a number of different

supply voltages as well as a power signal and an alarm signal,

the Court concludes Defendant's Freedom Universal, Freedom LP,

and Freedom A, A+, and C products also infringe dependent Claims

2-4 of the '994 Patent.

**C.    Claim 5 of the '994 Patent.**

Dependent Claim 5 provides "[a] cable management

apparatus as defined in Claim 1, wherein the plurality electronic

devices [*sic*] includes as least one camera."

Based on Defendant's concession regarding the dependent

claims of the '994 Patent and on Goldberg's testimony that the

Freedom Universal and Freedom A, A+, and C products are designed

to operate a camera, the Court also concludes the Freedom

Universal and Freedom A, A+, and C products infringe dependent

Claim 5 of the '994 Patent.

**D.    Claims 6 and 7 of the '994 Patent.**

Dependent Claims 6 and 7 provide:

> 6.    A cable management apparatus as defined
> in claim 1, further including a base that holds
> the reel and that is adapted to be mounted to a
> surface associated with a product display.

> 7.    A cable management apparatus as defined
> in claim 1, wherein each of the plurality of cable
> assemblies associated with the plurality of

34 - AMENDED OPINION AND ORDER

electronic devices includes a connector adapted to
mate with one of the plurality of electronic
devices.

Based on Defendant's concession regarding the dependent
claims of the '994 Patent and on evidence in the record that
reflects Defendant's products include a base that holds a reel
that is adapted to be mounted to a product-display surface and
includes a connector adapted to mate with one of the plurality of
electronic devices, the Court concludes Defendant's Freedom
Universal, Freedom LP, and Freedom A, A+, and C products infringe
dependent Claims 6 and 7 of the '994 Patent.

**E.    Claim 8 of the '994 Patent.**

Independent Claim 8 provides:

a plurality of retractable cable assemblies,
each of which includes a length, a modular
connector, a multi-conductor cable, and a
retractable reel on which at least a portion of
the length of the multi-conductor cable is wound;
and

a plurality of modular cable assemblies, each
of which is associated with at least one of a
plurality of electronic devices and each of which
includes a first end adapted to be electrically
coupled to the multi-conductor cable and a second
end adapted to be electrically coupled to one or
more of the plurality of electronic devices
wherein each of the plurality of retractable cable
assemblies is configured to be electrically
coupled to each of the plurality of modular cable
assemblies via the modular connector.

At the *Markman* hearing, the parties agreed the only
material difference between independent Claims 1 and 8 is that
Claim 1 relates to an individual apparatus and Claim 8 is a

35 - AMENDED OPINION AND ORDER

system or "plurality" of apparatuses of the kind described in
Claim 1.  Defendant does not make any separate argument as to
independent Claim 8, but relies on its arguments related to Claim
1.  It is undisputed that Defendant sells its Freedom products as
a system with multiple apparatuses or "positions."

On this record and for the reasons the Court found
Defendant's Freedom products infringe Claim 1 of the '994 Patent,
the Court also concludes Defendant's Freedom products infringe
Claim 8 of the '994 Patent.

**F.   Claims 9 and 11 of the '994 Patent.**

Dependent Claims 9 and 11 provide:

> 9.   A cable management system as defined in
> claim 8, wherein each of the multi-conductor
> cables is adapted to curry [*sic*] a plurality of
> electrical signals including at least one of a
> power signal and a security signal.

> 11.  A cable management system as defined in
> claim 8, wherein each of the plurality of
> retractable cable assemblies is adapted to be
> mounted to a surface associated with a product
> display.

Dependent Claim 9 is the "plural" of dependent Claim 2,
and dependent Claim 11 is the "plural" of dependent Claim 6.
Both describe cable-management systems rather than cable-
management apparatuses, but the substantive requirements of the
claims are the same as those in dependent Claims 2 and 6.

Accordingly, for the reasons the Court concluded
Defendant's Freedom products infringe dependent Claims 2 and 6,

the Court concludes those products infringe dependent Claims 9
and 11.

**G.    Claim 10 of the '994 Patent.**

Dependent Claim 10 provides "[a] cable management
system as defined in Claim 8, wherein each of the plurality of
retractable cable assemblies is adapted to be electrically
coupled to at least one of a power source and a security unit."

The record reflects Defendant's Freedom product systems
operate "from one or two 15Vdc power supplies."  Pls.' Exs. 14,
15.  The systems include an alarm module, which is "responsible
for providing the alarm output, alarm control, and power
distribution," as well as "managing the security functions of the
system."  Pls.' Ex. 14 at §§ 4.2.1 and 4.2.2.  The system is
"wired in a point to point format - alarm module to puck."  Pls.'
Ex. 14 at § 4.1(J).  Accordingly, the system of Freedom products
is adapted to be electrically coupled to either a power source or
a security unit.

On this record and pursuant to Defendant's concession
as to the dependent claims of the '994 Patent, the Court
concludes Defendant's Freedom products infringe Claim 10 of the
'994 Patent.

**II.  Judicial estoppel.**

Defendant also argues the Court should judicially estop
Plaintiffs from relying on "shifting" definitions of the first

37 - AMENDED OPINION AND ORDER

cable assembly.

Specifically, Defendant points out that Plaintiffs submitted a Declaration from Lee Grossman in the 2005 action in which he identified a first cable assembly in the preferred embodiment that is different from the first cable assembly that Plaintiffs describe in this action. Defendant also asserts Plaintiffs did not identify the ECB as part of the first cable assembly of the '994 Patent in an email conferral that took place before Plaintiffs filed this Motion for Summary Judgment. Finally, Defendant asserts Plaintiffs should be estopped from asserting that Defendant is liable for infringement before February 10, 2006, because Vanguard submitted sworn statements and made "other representations" to the Court and others that Defendant was not infringing as of that date.

**A.    Standards.**

The Supreme Court has described judicial estoppel as follows:

> [S]everal factors typically inform the decision whether to apply the doctrine [of judicial estoppel] in a particular case: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations. A third consideration is whether

the party seeking to assert an inconsistent
position would derive an unfair advantage or
impose an unfair detriment on the opposing party
if not estopped.

In enumerating these factors, we do not establish
inflexible prerequisites or an exhaustive formula
for determining the applicability of judicial
estoppel.

*New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

**B.    Representations by Lee Grossman and Plaintiffs.**

As noted, Defendant asserts Plaintiffs identified a
different first cable assembly in their Motion to Dismiss filed
in the 2005 action.  Plaintiffs' Memorandum in support of their
Motion in that matter, however, indicates Plaintiffs' right to
exclude Defendant from buying only the retractor also was an
issue at that time.  In their Motion, Plaintiffs asserted their
retractors are one component of their patented product and that
they had the right to require Defendant to purchase the entire
patented product.  The definition of the first cable assembly
under the '994 Patent was not at issue, and, in any event, Lee
Grossman was not acting as an infringement expert when he
submitted his Declaration.

On this record, the Court concludes Lee Grossman in his
Declaration and Plaintiffs in their Memorandum in support of
their Motion to Dismiss in the 2005 action did not take
sufficiently specific positions as to what is encompassed in the
first cable assembly in the '994 Patent to justify estopping

39 - AMENDED OPINION AND ORDER

Plaintiffs from the arguments they now make.  In any event, to
the extent that Plaintiffs took a position, they did not persuade
the Court at that time to accept their position as to the
location of the first cable assembly.

In light of the fact that the Court did not need to
interpret in the 2005 action what is encompassed by the first
cable assembly in the '994 Patent, the Court concludes it would
be inappropriate to apply judicial estoppel against Plaintiffs in
this action on that basis.

**C.    Plaintiffs' "conferral" email.**

Defendant asserts Plaintiffs changed positions as to
what is encompassed by the first cable assembly in the '994
Patent after the parties conferred about Plaintiffs' Motion for
Summary Judgment on the issue of infringement.  In the email that
includes their analysis of infringement, however, Plaintiffs
specifically note their position as to what encompasses the first
cable assembly is "preliminary . . . for purposes of discussion."
After Defendant advised Plaintiffs of its opinion that the first
cable assembly does not include the ECB, Plaintiffs informed
Defendant that they believe the first cable assembly does, in
fact, include the ECB.

On this record, the Court concludes Plaintiffs'
position in the conferral email was preliminary and for
discussion purposes only and, therefore, is not a sufficient

40 - AMENDED OPINION AND ORDER

basis to judicially estop Plaintiffs from asserting their desired position.  Accordingly, the Court declines to apply the doctrine of judicial estoppel against Plaintiffs based on the position they took during conferral with Defendant before filing their Motion.

**D.   Infringement before February 10, 2006.**

Finally, Defendant contends the Court should judicially estop Plaintiffs from asserting Defendant infringed the '994 Patent before February 10, 2006, because in the 2005 action Plaintiffs made representations to the Court in their Motion to Dismiss that contradict their current position that Defendant is liable for infringement at least from February 25, 2005. Defendant cites the following statements of Plaintiffs in their Motion to Dismiss in the 2005 action:

> [W]ith regard to [the retractors Defendant purchased from Plaintiffs], **there cannot be any infringement** as a matter of law because it is fundamental that once a sale is made, [Defendant] has an implied license to use those products. *Antonm/Bauer, Inc. v. PAG*, *LTD*., 329 F.3d 1343, 1350 (Fed. Cir. 2003); *Met-Coil Systems Corp. v. Korners Unlimited, Inc*., 803 F.2d 684, 686 (Fed. Cir. 1986).  Thus, as a matter of law there <u>cannot</u> be any apprehension of immediate litigation if there cannot be any litigation with regard to the retractors Telefonix or Vanguard sold to Plaintiff from the year 2000 up until the present time . . . .  Accordingly, because Telefonix, or its executive licensee Vanguard, sold these retractors to [Defendant], the [Plaintiffs] do not believe that [Defendant] is infringing the '994 patent.

Curley Decl., Ex. A at 4 (emphasis in original).[4]   Defendant

points to the Affidavit of Allison Burke filed in the 2005 action

in which Burke testified:

> I can affirmatively state that as of the time that
> the Complaint was filed [August 1, 2005], we never
> believed [Defendant] was an infringer of the '994
> patent since it had been purchasing parts from
> either Telefonix or Vanguard Products Group, Inc.
>
> Even today, we have no reason to believe that
> [Defendant] is an infringer of the '994 patent.
> On October 13, 2005 . . . counsel for [Defendant]
> sent a sample of [Defendant's] product to
> Telefonix's counsel.  [Defendant's] product still
> contains a retractor purchased from . . .
> Vanguard.  Therefore, to the best of our
> knowledge, we still do not believe [Defendant] is
> an infringer of the '994 patent.

Curley Decl., Ex. B at ¶¶ 6-7.  Defendant also relies on the

Affidavit of Christopher Kelsch submitted in the 2005 action in

which he testified:

> I can affirmatively state that as of the time that
> this action was filed on August 1, 2005, we never
> believed [Defendant] was an infringer of the '994
> patent because it had been purchasing parts from
> either Vanguard . . . or Telefonix.
>
> Even today, we have no reason to believe that
> [Defendant] is an infringer of the '994 patent.
> On June 10, 2005, Vanguard shipped [Defendant]
> 7,500 retractors . . . .  On October 13, 2005
> . . . counsel for [Defendant] sent a sample of

---

[4] Defendant appears to assert that Plaintiffs made these
statements on February 10, 2006, and, therefore, that is the date
the Court should use for judicial estoppel.  The Court notes,
however, that Plaintiffs filed the Memorandum in support of their
Motion to Dismiss and the associated Declarations on October 31,
2005.  Accordingly, estoppel would apply from October 31, 2005,
rather than February 10, 2006.

> [Defendant's] product to Vanguard's counsel.
> [Defendant's] product still contains a retractor
> purchased from . . . Vanguard.  Therefore, to the
> best of our knowledge, because [Defendant] still
> uses our retractor, we still do not believe
> [Defendant] is an infringer of the '994 patent.

Curley Decl., Ex. C. at ¶¶ 6-7.[5]

In response, Plaintiffs explain they did not know that Defendant was using reels purchased from a vendor other than Vanguard at the time of the testimony upon which Defendant relies.  The Court notes the Affidavits referenced by Defendant are couched in conditional terms, and the Affiant in each Affidavit states "to the best of [his] knowledge" that he did not believe Defendant was infringing the '994 Patent at the time.  In addition, discovery in this action establishes Defendant began ordering replacement retractors from a supplier other than Vanguard in August 2005.  *See* Decl. of Jacob Gill, Ex. 17 at ¶ 18.  *See also* Suppl. Decl. of Timothy DeJong, Ex. 1.

On this record, therefore, the Court declines to apply judicial estoppel against Plaintiffs based on the statements they made in the 2005 action because those statements concerned limited information that Plaintiffs had available at the time of that action.

---

[5] The Court relied on this testimony when it considered the totality of the circumstances surrounding the 2005 action and concluded it lacked subject-matter jurisdiction over the declaratory-judgment patent claims in that action.

43 - AMENDED OPINION AND ORDER

III. Invalidity

    A.   Obviousness.

        Even if the Court concludes Defendant's products infringe the '994 Patent, Defendant asserts the Court should declare the '994 Patent invalid on the ground of obviousness under 35 U.S.C. § 103.

        1.    Standards.

        Because a patent issued by the PTO is presumed to be valid pursuant to 35 U.S.C. § 282, the party seeking a ruling of invalidity must present clear and convincing evidence of facts to support such a ruling. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999). The Patent Act

> forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

*KSR Intern. Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 (2007) (quoting 35 U.S.C. § 103). To determine obviousness, the Court must engage in an objective analysis described by the Supreme Court as follows:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. . . . Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might

> be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.
>
> While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls.

*Id*. (quotation omitted).

### 2. **Analysis**.

Defendant asserts the '994 Patent is obvious under § 103 because "the critical elements of the '994 Patent claims were known and in the prior art before the filing date of the '994 Patent, . . . and it would be obvious to anyone to connect them together and produce the subject matter that is set forth in the claims of the '994 Patent."

> The Supreme Court has noted
>
> when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result. . . . [W]hen a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.

*KSR Int'l*, 127 S. Ct. at 1740 (quotations omitted).  In addition,

> [i]f a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.  For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. . . . [A] court must ask whether the improvement is more than the predictable use of

>  prior art elements according to their established
>  functions.

*Id.*

Although the Supreme Court rejected the Federal

Circuit's rigid application of the "teaching, suggestion or

motivation" test, the Court acknowledged

>  the claimed subject matter may involve more than
>  the simple substitution of one known element for
>  another or the mere application of a known
>  technique to a piece of prior art ready for the
>  improvement.  Often, it will be necessary for a
>  court to look to . . . the background knowledge
>  possessed by a person having ordinary skill in the
>  art, . . . to determine whether there was an
>  apparent reason to combine the known elements in
>  the fashion claimed by the patent at issue.  To
>  facilitate review, this analysis should be made
>  explicit.  *See In re Kahn*, 441 F.3d 977, 988 (Fed.
>  Cir. 2006)("[R]ejections on obviousness grounds
>  cannot be sustained by mere conclusory statements;
>  instead, there must be some articulated reasoning
>  with some rational underpinning to support the
>  legal conclusion of obviousness").

>                          * * *

>  [A] patent composed of several elements is not
>  proved obvious merely by demonstrating that each
>  of its elements was, independently, known in the
>  prior art.  Although common sense directs one to
>  look with care at a patent application that claims
>  as innovation the combination of two known devices
>  according to their established functions, it can
>  be important to identify a reason that would have
>  prompted a person of ordinary skill in the
>  relevant field to combine the elements in the way
>  the claimed new invention does.  This is so
>  because inventions in most, if not all, instances
>  rely upon building blocks long since uncovered,
>  and claimed discoveries almost of necessity will
>  be combinations of what, in some sense, is already
>  known.

46 – AMENDED OPINION AND ORDER

*Id.* at 1740-41.

Plaintiffs assert Defendant has not provided any basis for its assertion that a person of ordinary skill in the art would have combined the prior art in the manner taught by the '994 Patent.  Plaintiffs also argue Defendant has failed to meet its burden to compare adequately the scope of the alleged prior art to the claims of the '994 Patent and to explain why the differences are not material.

**a.   Person of ordinary skill in the art.**

"The person of ordinary skill in the art is a theoretical construct used in determining obviousness under § 103, and is not descriptive of some particular individual." *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.* 122 F.3d 1040, 1042 (Fed. Cir. 1997).

> "Factors that may be considered in determining
> level of ordinary skill in the art include:
> (1) the educational level of the inventor;
> (2) type of problems encountered in the art;
> (3) prior art solutions to those problems;
> (4) rapidity with which innovations are made;
> (5) sophistication of the technology; and
> (6) educational level of active workers in the
> field." *Envtl. Designs, Ltd. v. Union Oil Co.*,
> 713 F.2d 693, 696 (Fed. Cir. 1983)(citing
> *Orthopedic Equip. Co. v. All Orthopedic*
> *Appliances, Inc.*, 707 F.2d 1376, 1381-82 (Fed.
> Cir. 1983)).  These factors are not exhaustive but
> are merely a guide to determining the level of
> ordinary skill in the art.

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).  Although Defendant cited the factors noted in

*Daiichi*, Defendant did not apply or provide any analysis of those
factors.  Instead Defendant asserts only that "Paul Burke, the
inventor of the '994 patent, reflects the person of ordinary
skill concerning the technology at issue here."  As to the issue
of obviousness, however, the Court notes the Supreme Court
specifically stated "[t]he question is not whether the
combination was obvious to the patentee but whether the
combination was obvious to a person with ordinary skill in the
art."  *KRS Int'l*, 127 S. Ct. at 1742.  The inquiry does not focus
on the inventor because

> [i]nventors, as a class, according to the concepts
> underlying the Constitution and the statutes that
> have created the patent system, possess something
> - call it what you will - which sets them apart
> from the workers of ordinary skill, and one should
> not go about determining obviousness under § 103
> by inquiring into what patentees (*i.e.*, inventors)
> would have known or would likely have done, faced
> with the revelations of references.

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed.
Cir. 1985).  When the parties provide little guidance as to the
nature of a person of ordinary skill in the art, it is "up to the
court . . . to determine the level of skill of the hypothetical
person of ordinary skill and what that person would have been
able to do when in possession of the prior art."  *Id.*

        Nonetheless, Plaintiffs do not appear to
dispute that a person like Paul Burke, President of Telefonix,
would be a person of ordinary skill in the art.  The record

48 - AMENDED OPINION AND ORDER

reflects Burke received a four-year degree with a major in business and a minor in engineering. Burke began working with "electrical and mechanical digital cord reels in 1986," Curley Decl., Ex. O at 3, and began working with systems that "were electronically integrated with a sensor to set off an alarm through a cord going through the recoiler" in 1991 or 1992. *Id*. at 4. Burke also worked in manufacturing and operations. *Id*. at 6.

On this limited record, the Court concludes a theoretical ordinary person with skill in the art includes an individual with a four-year degree in engineering who had extensive experience related to cord reels and who was familiar with business management and operations functions.

**b. Scope and content of prior art**.

Defendant asserts it is "old and known" to use a reel to retract a first cable assembly or, for that matter, any cable assembly. To support its contention, Defendant points to two patents for types of retractable telephone extension cords (Patent Nos. 5,544,836 and 4,989,805). In addition, Defendant maintains "it was known" to use a modular connector to connect a first and second cable assembly relying on a patent for a modular cord coupler jack for a telephone (Patent No. 4,379,609). Defendant also contends prior designs "suggest" using a mounting member to hold or to receive the end of a cable relying on a

49 - AMENDED OPINION AND ORDER

patent for a security-display system (Patent No. 5,146,205). Finally, Defendant states Patent No. 5,861,807 ('807 Patent) "illustrates placing a modular connector in a 'puck' so that the end of a cable can plug into it."

With respect to the '807 Patent, Plaintiffs note the items identified by Defendant as the first and second cable assemblies are not electronically coupled to any of a plurality of electronic devices.  Instead the '807 Patent discloses the sensor attached to the second cable assembly is taped to the camera or electronic device for display.  In addition, according to Plaintiffs, the item that Defendant identifies as the second cable assembly is not a cable assembly from a plurality of cable assemblies associated with the plurality of electronic devices.

Plaintiffs also note the other patents that Defendant identifies are for devices that do not encompass the system taught in Claim 1 of the '994 Patent.  The Court agrees. The devices described in the patents identified by Defendants mainly relate either to cord management or mounting of items for display.  These patents do not teach a single cable-management system that provides for easy adaption to various consumer electronics with different connection and power requirements while also maintaining security features.

On this record, the Court concludes Defendant

50 - AMENDED OPINION AND ORDER

has not established an issue of fact as to whether it would be
obvious to a person of ordinary skill in the art "facing the wide
range of needs created by the field of endeavor" that a cable-
management system should be configured to include a second cable
assembly adapted to electrically couple "at least one of the
plurality of electronic devices to the end of the first cable
assembly, and wherein the first cable assembly is configured to
be electrically coupled to each of the plurality of cable
assemblies via the modular connector."  It follows, therefore,
that Defendant cannot meet its burden by clear and convincing
evidence.

      The Court, therefore, denies Defendant's Motion
for Summary Judgment as to the issue of obviousness.

    **B.   Indefiniteness.**

      Defendant also contends the '994 Patent is invalid on
the ground of indefiniteness because it does not meet the
"description" requirements of 35 U.S.C. § 112, which provides in
pertinent part:

> The specification shall contain a written
> description of the invention, and of the manner
> and process of making and using it, in such full,
> clear, concise, and exact terms as to enable any
> person skilled in the art to which it pertains, or
> with which it is most nearly connected, to make
> and use the same, and shall set forth the best
> mode contemplated by the inventor of carrying out
> his invention.

    **1.   Standards.**

51 - AMENDED OPINION AND ORDER

Issued patents are presumed to be valid and to comply with the requirements of § 112. *Nat'l Recovery Tech., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195 (Fed. Cir. 1999).  The party asserting invalidity for failure to meet the requirements of § 112, therefore, must "clearly and convincingly" establish facts showing such failure. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003).

Under the requirements of § 112,

[t]he specification need not explicitly teach those in the art to make and use the invention; the requirement is satisfied if, given what they already know, the specification teaches those in the art enough that they can make and use the invention without "undue experimentation."

*Id*. (quoting *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)).  Ultimately, the patent specification "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invested what is claimed.'" *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998)(quoting *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989)).  Compliance with the requirements of § 112 is measured by the understanding of one of ordinary skill in the art. *Amgen*, 935 F.2d at 1330.

2.  **Analysis**.

According to Defendant, the '994 Patent does not satisfy the description requirements of § 112 because "[t]here is

52 – AMENDED OPINION AND ORDER

no way that a person skilled in the art could discern how to implement the invention claimed by [Plaintiff] (without requiring a direct wire-to-wire connection) from what the '994 patent describes and/or without undue experimentation."  Specifically, Defendant asserts the '994 Patent does not satisfy the requirements of § 112 because there is not anything in the patent text or drawings to explain how to accomplish an "electrical coupling" by doing something other than a "wire-to-wire connection."

        As noted, the Court declined in the *Markman* hearing to interpret Claim 1 to require a direct wire-to-wire connection between the first and second cable assemblies and the device displayed.  Defendant does not point to any evidence on the record that establishes a person of ordinary skill in the art would not have understood the '994 Patent described an invention employing any means of electrical coupling between the first and second cable assemblies.  Defendant also did not present evidence describing the amount of experimentation that a person of ordinary skill in the art would need to develop Plaintiff's product in view of the disclosures of the '994 Patent. Defendant, therefore, has not presented facts to show a jury question sufficient to overcome the presumption that the '994 Patent's is validity pursuant to § 112. *See Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998)("[I]t is

53 - AMENDED OPINION AND ORDER

imperative when attempting to prove lack of enablement to show
that one of ordinary skill in the art would be unable to make the
claimed invention without undue experimentation."). *See also*
*Moba B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1321 (Fed.
Cir. 2003)(court upheld jury verdict that the patent was not
invalid for lack of enablement because the alleged infringer
"presented no record evidence recounting the amount of
experimentation one of skill in the art would require to develop
the [infringing product] in view of the [asserted] patent
disclosure.").

> In his Declaration, John Hunt testifies
>
> a person of ordinary skill in the art would have
> understood that Mr. Burke's invention encompassed
> embodiments that accomplish an electrical coupling
> between a displayed device and the power source
> through other combinations of electrical
> components, including, for example, fuses,
> resistors, switches, transistors, integrated
> circuits (including voltage regulators), etc.
>
> * * *
>
> [A] person of ordinary skill in the art would have
> been able to make the claimed invention without
> undue experimentation.  Such a person would have
> been able to make the preferred embodiment
> described in the specification and also would have
> recognized and been able to make other embodiments
> of the claims invention.  For example, a person of
> ordinary skill in the art, guided by the '994
> patent would have recognized that a voltage
> regulator could be used in the conductive path in
> place of the cable carrying multiple voltages on
> separate conductors of the preferred embodiment
> and such person would have been able to make such
> an embodiment of the claimed invention.

54 - AMENDED OPINION AND ORDER

Hunt Decl. ¶¶ 4-5.

On this record, the Court concludes Defendant has not established the '994 Patent fails to satisfy the requirements of § 112 and, therefore, Defendant has not overcome the presumption of validity as to the '994 Patent. Accordingly, the Court denies Defendant's Motion for Summary Judgment as to the issue of the '994 Patent's compliance with § 112.

In summary, the Court grants Plaintiffs' Motion (#116) for Summary Judgment and denies Defendant's Motion (#132) for Summary Judgment as to the issue of infringement. The Court also denies Defendant's Motion (#132) for Summary Judgment as to the issues of judicial estoppel, obviousness, and failure to comply with the requirements of 35 U.S.C. § 112.

## PLAINTIFFS' MOTION (#160) FOR PARTIAL SUMMARY JUDGMENT (FALSE MARKING)

Plaintiffs move for summary judgment on Defendant's Counterclaim for false marking in violation of 35 U.S.C. § 292.

### Background

Between June 10, 2002, and June 7, 2004, Telefonix marked a number of retractors as "US Patent 6,386,906" ('906 Patent) and shipped them to various customers, including Vanguard. During that time, Vanguard sold to Defendant some of the retractors marked "US Patent 6,386,906." The retractors themselves were not covered by the '906 Patent, but, according to Plaintiffs, they

55 - AMENDED OPINION AND ORDER

are one element of the inventions claimed in the '906 Patent.

Plaintiffs have not brought an action against Defendant for infringement of the '906 Patent, but Plaintiffs allege for purposes of Defendant's false marking Counterclaim that Defendant's "unibase" products are covered by the '906 Patent.

**Standards**

35 U.S.C. § 292(a) provides:

> Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented for the purpose of deceiving the public . . . [s]hall be fined not more than $500 for every such offense.

The case law in the Federal Circuit is "sparse" on § 292. *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1351 (Fed. Cir. 2005). To establish a violation of § 292, the party bringing the claim must show (1) an unpatented article (*i.e.*, an article "not covered by at least one claim of [the] patent with which the article is marked") is, nevertheless, marked with the word "Patent" and (2) the mismarking was done with the "purpose of deceiving the public." *Id*. at 1352.

When determining whether a mismarking was for the purpose of deceiving the public, the *Clontech* court cited with approval *London v. Everett H. Dunbar Corp.*, a 1910 opinion from the First Circuit interpreting a predecessor statute to § 292. The Federal Circuit concluded when

one "has an honest, though mistaken, belief that

56 – AMENDED OPINION AND ORDER

>upon a proper construction of the patent it covers
>the article which he marks," the requisite intent
>to deceive the public would not be shown.

*Clontech Labs., Inc.,* 406 F.3d at 1352 (quoting *London*, 179

F. 506, 510 (1st Cir. 1910)).  The court also cited with approval

an opinion from the Fifth Circuit that "an honest, though

mistaken, mismarking of an article would not trigger liability

under the statute."  *Id.* (citing *Brose v. Sears, Roebuck and Co.*,

455 F.2d 763, 768-69 (5th Cir. 1972)).  The Federal Circuit

concluded

>to establish knowledge of falsity the plaintiff
>must show by a preponderance of the evidence that
>the party accused of false marking did not have a
>reasonable belief that the articles were properly
>marked (*i.e.*, covered by a patent).  Absent such
>proof of lack of reasonable belief, no liability
>under the statute ensues.

*Id.* at 1352-53.

Section 292(a) applies only when one does not have a

plausible position that the marking is proper.  *See Kemin Foods,*

*L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d

1339, 1355 (Fed. Cir. 2006)(The plaintiff's "legal position as to

the scope of the '714 patent is sufficiently plausible that [the

plaintiff] cannot be said to have acted with the deceptive

purpose necessary to trigger liability under the false marking

statute.").  *See also Cent. Admixture Pharm. Serv., Inc. v.*

*Advanced Cardiac Solutions, P.C.*, No. CV-00-2430-VEH, 2006 WL

4448613 (N.D. Ala. Jan, 13, 2006), *rev'd on other grounds by* 482

57 - AMENDED OPINION AND ORDER

F.3d 1347, 1358 (Fed. Cir. 2007)("Intent to deceive is proved when . . . the differences between the mismarked article and a properly marked article are so plain that no one in good faith could think otherwise.")(quotation omitted).

## Discussion

Plaintiffs concede the '906 Patent does not cover the retractor as an individual item.  They contend, however, it is legal to mark a component part that is to be used in an apparatus covered by the Patent.  *Amisted Indus., Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 185 (Fed. Cir. 1994).  According to Plaintiffs, therefore, the proper inquiry for the Court is whether Plaintiffs knew the retractors were sold for use as a component of products not covered by the '906 Patent.

Defendant, however, asserts Plaintiffs have not established that the marked retractors allegedly covered by the '906 Patent were actually used in Defendant's products or in the products of other companies.  Defendant also notes Plaintiffs have had issues with improper marking on other products related to two other patents.  Defendant contends, therefore, the Court may infer from these circumstances that Plaintiffs do not have a reasonable belief that they properly marked the retractors used in Defendant's products.

**A.    Defendant's false-marking Counterclaim related to the '906 Patent.**

The parties did not provide the Court with an analysis

58 - AMENDED OPINION AND ORDER

of the claims of the '906 Patent or whether Defendant's products
that contained the marked retractors are covered by the '906
Patent.  The Court, therefore, concludes Defendant's false-
marking Counterclaim is not in an appropriate procedural posture
from which the Court can conduct a proper claims construction and
infringement analysis of the '906 Patent.  The Court, therefore,
will analyze generally from the available facts here in the light
most favorable to Defendant whether the products within
Defendant's retractors were so obviously not covered by the '906
Patent that the Court could infer Telefonix did not reasonably
believe it was properly marking its retractors.

   In *Central Admixture*, the district court granted
summary judgment as to the defendant's false-marking counterclaim
on the following grounds:

> We can assume that if a device claimed to be
> covered by license of a cited patent is so
> obviously not revealed by it as the patentese
> world would view it, the use of such a legend
> would be mismarking.  But where the device is
> within the specific field covered by the patent
> and uses materials and methods similar to the
> technical patent disclosures, the licensee's use
> in good faith reliance on the license is not to be
> transmuted into an evil purpose to deceive the
> public merely on proof and finding that for one or
> more or all of the reasons skilled patent
> advocates could think up, the embodiment in
> question does "not read on" or is not an
> "infringement" of the cited patent.

2006 WL 4448613, at *25.  The Federal Circuit reversed the
district court's decision on infringement, but specifically

59 - AMENDED OPINION AND ORDER

affirmed the district court's decision and reasoning as to false marking. *Cent. Admixture Pharm. Serv., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1358 (Fed. Cir. 2007). *See also Kemin Foods*, 464 F.3d at 1355 (although the jury found there was not any infringement, the court concluded there was not any fraudulent intent when the patentee maintained throughout the action that the patent at issue was broad enough to encompass the relevant products).

A brief review of the '906 Patent does not suggest Defendant's unibase systems are "so obviously not revealed by [those systems] as the patentese world would view it [that] the use of [the '906 Patent] legend would be misleading." For example, Claim 1 of the '906 Patent recites a base member, a mounting member, an electrical cable, a reel (retractor), and a modular electrical adapter to electrically connect the displayed item to the cable, and Defendant's unibase products have base members, mounting members, multiple cables, and a reel (retractor). In addition, Defendant's devices are within the field covered by the '906 Patent and use materials similar to the disclosures of the '906 Patent.

Based on this record and for purposes of this Motion only, the Court concludes Defendant has not established a jury question as to whether their products with retractors were so obviously not covered by the '906 Patent that a rational juror

could infer Telefonix did not reasonably believe it was properly marking its retractors.

**B.   Plaintiffs previous marking problem.**

Defendant also asserts a rational juror could infer Plaintiffs lacked a reasonable belief that the marked retractors were being used as component parts of products not covered by the '906 Patent because Telefonix had made mistakes with marking in the past.  Specifically, Telefonix had marked other "security system recoilers" with telephone extension-cord Patent Nos. 4,989,805 and 5,094,396 in 1997 and 1998 when it was mistaken about the requirements of the law.  Paul Burke testified at deposition that Telefonix instituted safeguards to avoid the problem after counsel advised Telefonix to stop putting both patent numbers on the recoilers.  For example, Telefonix implemented systems to notify engineering and to change materials and drawings when patents were issued.  DeJong Decl., Ex. 4 at 4, 6.  Burke further testified Telefonix did not err to the best of his knowledge when it put the '906 Patent labels on the retractors at issue because the retractors were for use in products covered by the '906 Patent.  DeJong Decl., Ex. 4 at 4, 6.

This record is wholly insufficient to permit a rational juror to infer from Telefonix's marking of different components for different products with different patent numbers that

Telefonix lacked a reasonable belief that it was properly marking the retractors at issue, particularly in light of Burke's testimony that Telefonix instituted procedures to ensure proper marking and that he believes the retractors were properly marked with the '906 Patent.

In summary, the Court concludes on this record that Defendant has not shown there is an issue of material fact as to whether Plaintiffs falsely marked the retractors at issue with the '906 Patent or that Plaintiffs intended to defraud the public by doing so.  The Court, therefore, grants Plaintiffs' Motion for Summary Judgment as to Defendant's Counterclaim for false marking.

**C.   Damages calculation.**

The Court offers the following observations regarding damages for violations of § 292 because the parties have addressed the issue.

The parties dispute the legal standard for calculating damages for violations of § 292.  Specifically, Defendant argues Plaintiffs are subject to the $500 penalty for each unit improperly marked or a damages award of approximately $63 million against each Plaintiff.  Plaintiffs, however, assert the proper measure of any damages would be a total of $500 if the Court finds their entire alleged course of conduct violated § 292.

As noted, § 292 provides for a penalty of "not more

than $500 for every such offense."  The issue, therefore, would

be what constitutes an "offense" for purposes of the penalty

under § 292.  The law on this matter is limited.  In *London*, the

First Circuit rejected an approach similar to the one put forth

by Defendant.  The court concluded the "statute does not

prescribe a distinct penalty for each individual article marked,

but merely a penalty for the offense of marking." *London*, 179 F.

at 507.  The court concluded imposing a penalty for each unit

could lead to the illogical result

> that the false marking of small or cheap articles
> in great quantities will result in the
> accumulation of an enormous sum of penalties,
> entirely out of proportion to the value of the
> articles, while the marking of expensive machines
> used in limited numbers may result in the
> infliction of penalties which are comparatively
> slight in relation to the pecuniary value of the
> articles.

*Id.* at 508.  The court found "[i]t can hardly have been the

intent of Congress that penalties should accumulate as fast as a

printing press or stamping machine might operate." *Id.*  The

*London* court concluded, therefore, when marking is part of a

single continuous act, "there is but one offense . . . and only a

single penalty is recoverable, though more than one article may

have been marked." *Id.*  This approach has been followed by

numerous courts. *See, e.g., Republic Molding Corp. v. Gotham

Indust., Inc.*, 145 U.S.P.Q. 642, 643 (S.D. Cal. 1965); *Sadler-

Cisar, Inc. v. Commercial Sales Network, Inc.*, 786 F. Supp. 1287,

63 - AMENDED OPINION AND ORDER

1296 (N.D. Ohio 1991); *The Forest Group, Inc. v. Bon Tool Co.*, No. H-05-4127, 2008 WL 2962206, at *5 (S.D. Tex. June 29, 2008).

The Court notes Plaintiffs' suggested approach to the potential calculation of damages is supported by both the language of § 292 and by the persuasive authority noted above. Here there is evidence of one continuous course of conduct by Plaintiffs as to marking the retractors that are at issue with the '906 Patent, the record does not reflect a "divergence in either time or place, circumstance, or media, so as to set apart any one particular act of false marking as being separate and distinct from all other acts of false marking." *Republic Moulding*, 145 U.S.P.Q. at 643. Thus, although the Court has concluded Defendant did not establish any jury questions as to its false-marking Counterclaim, the Court, nevertheless, concludes Plaintiffs would only have been subject to a single penalty of $500 for their conduct even if Defendant had established such a claim.

**CONCLUSION**

For these reasons, the Court **GRANTS** Plaintiffs' Motion (#116) for Partial Summary Judgment (Infringement), **GRANTS** Plaintiffs' Motion (#160) for Partial Summary Judgment (False Marking), **GRANTS** Plaintiffs' Motion (#188) for Partial Summary Judgment (Equitable Estoppel), and **DENIES** Defendant's Motion

64 - AMENDED OPINION AND ORDER

(#132) for Summary Judgment (Noninfringement, Invalidity,

Obviousness).

IT IS SO ORDERED.

DATED this 16th day of January, 2009.


/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge


65 - AMENDED OPINION AND ORDER